UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.  CRIMINAL NO. 3:21-CR-132 (SVN)

CHAZ REDDICK  March 21, 2025

**REPLY TO GOVERNMENT'S MEMORANDUM**

Mr. Reddick respectfully requests that the Court release him subject to the proposed bond conditions set forth in his opening memorandum. Even if the Court has the authority to detain Mr. Reddick pre-revocation, the proposed release conditions are sufficient to mitigate against the *specific* risks posed by Mr. Reddick given the alleged violations of supervised release. Releasing Mr. Reddick would allow him to return to a job that is providing him with a meaningful opportunity to gain skills and grow as a person, under the careful supervision of Tommy Battle, a Reentry Court graduate; continue with his substance abuse treatment; and receive necessary medical care. Moreover, release would allow Mr. Reddick the opportunity to resolve the state charges which are still in their infancy. The charges will not be resolved in any kind of expeditious manner if he remains detained in federal custody.

If the Court releases Mr. Reddick on the proposed bond conditions, it need not reach the question of whether there is statutory authority to detain supervisee pre-revocation. But if the Court reaches that issue, Mr. Reddick respectfully requests that the Court release him because there is no statutory authority for his continued detention. The Non-Detention Act requires *Congressional* approval for detention. Much as the government protests otherwise, Congress has not passed a statute authorizing detention here and that lack of statutory authorization cannot be cured by reference to a procedural rule.

I. **The proposed release conditions are sufficient to mitigate against the specific risk posed by Mr. Reddick.**

The bond conditions proposed by Mr. Reddick as part of this motion are incredibly strict and are in fact *more* stringent than the proposal to Magistrate Judge Richardson.[1] They include:

1. Residence at his current residence in New Haven, Connecticut, with his long-term partner and child;
2. Subject to home detention and GPS monitoring;
3. Third Party custodianship by Leensha Hicks and Tommy Battle (his employer);
4. A bond to be co-signed by Ms. Hicks; and
5. All other conditions of supervised release, including participation in substance abuse treatment.

When combined, these conditions address the specific risks posed by Mr. Reddick. His most recent state court arrest—which resulted in a relatively low state bond—occurred while Mr. Reddick was under the influence of narcotics and outside the home. Following his arrest, Mr. Reddick successfully engaged in IOP and, for the first time in his life, secured meaningful employment at an organization that provided him with the chance to make a positive impact on his community. His work at the Full Citizens Coalition gave him the opportunity to earn an honest living and to learn skills to help him going forward.

Risk is not measured in a vacuum. As the government concedes, none of Mr. Reddick's prior probation or parole violations involve the strict supervision envisioned here.[2] Moreover, contrary to the government's contention, they do mitigate against the possibility of Mr. Reddick "walking out of

---

[1] Magistrate Judge Richardson noted this was a "close call" and might have made a different ruling had this bond package been presented initially.

[2] As the Court is no doubt aware, parole, or even probation, in the state does not involve the kind of in-depth supervision that is contemplated here.

his residence to sell drugs or carry a gun." While on home detention, Mr. Reddick must pre-schedule all his trips outside the house. If he were to leave his residence at an unapproved time, the Probation office would be automatically notified in real time and would immediately contact Mr. Reddick—through the GPS monitor, if he could not be reached by phone. This real-time monitoring provides a meaningful check on Mr. Reddick's behavior.

Mr. Reddick has the opportunity now to earn a living engaging in meaningful work—something he has never had before. Continued detention might "protect the public" in the very short term. Rehabilitation—which is best facilitated through employment and substance abuse treatment—would protect the public for far longer. Under the conditions proposed here, Mr. Reddick can be given the chance to rehabilitate himself safely.

II. **The Non-Detention Act precludes pre-revocation detention in the absence of explicit statutory authorization.**

The Non-Detention Act ("NDA") is clear: the government cannot detain a citizen absent statutory authorization. The government proffers pages of legislative history to suggest to the Court that Congress has somehow implicitly authorized pre-revocation detention of supervisees. The voluminous briefing is necessary because the government cannot escape the simple fact that no *statute* actually authorizes the detention of Mr. Reddick in these circumstances. As much as the revocation system may have *anticipated* that pre-revocation was available, anticipation of an outcome is not a substitute for Congress actually passing a statute when statutory authorization is required. "[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do. There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted . . . . Nor is the Judiciary licensed to attempt to soften the

3

clear import of Congress' chosen words whenever a court believes those words lead to a harsh result." *United States v. Locke*, 471 U.S. 84, 95 (1985).[3] *See also United States v. Wade*, No. 1:09-CR-260-WMS-JJM, 2025 WL 786383, at *3 (W.D.N.Y. Mar. 12, 2025) (finding that there is no statutory authority to detain supervisees pre-revocation).

    A.    <u>The legislative history of the Non-Detention Act supports the application to Mr. Reddick.</u>

The government suggests that the Non-Detention Act is an "unlikely candidate" to constrain the Court's authority to detain a person on supervised release because it was passed in response to the internment of Japanese American citizens during World War II. Doc. No. 66 at 4. The government does not dispute, however, that the plain text of the statute applies to Mr. Reddick. And, contrary to the government's claims, the legislative history is clear that Congress was aware of the far-reaching applications of the NDA.

The Committee Report from the Committee on the Judiciary for the Non-Detention Act supports the application of the NDA to Mr. Reddick. It is, of course, clear that Japanese internment was front of mind when Congress passed the Non-Detention Act in 1971. H.R. Rep. No. 92-116 (1971). Yet, broader principles about detention and Congress's role in authorizing it were at play. Speaking in support of the bill, Representative Evins noted that "freedom-loving Americans everywhere have recognized the fact that the Congress of the United States is not only a defender of

---

[3] *See also Dodd v. United States*, 545 U.S. 353, 359 (2005) ("[a]lthough we recognize the potential for harsh results in some cases, we are not free to rewrite the statute that Congress has enacted"); *Helvering v. Ohio Leather Co.,* 317 U.S. 102, 110 (1942) ("arguments urging the broadening of a...statute beyond its plain meaning to avoid harsh results are more properly addressed to Congress than to the courts").

4

the Nation's security, but also the first line of defense against any encroachment on individual liberty." 177 Cong. Rec. 31535 (1971) (statement of Rep. Joe Evins). This bill, his remarks indicate, was intended to place *Congress* in a position to protect the public from overreach by virtue of detention imposed by the other branches without statutory authority. Only where Congress had carefully evaluated and passed laws encroaching on individual liberty would Congress accept detention of citizens. That is precisely the situation here—Mr. Reddick is being detained absent Congress's careful consideration and authorization.

The bill's scope as written was also a prominent consideration. Some Congressmembers who opposed internment still objected to the statute based on how broadly it had been written. Representative Smith argued that the statute as written was tantamount to Congress saying "that nothing can be done, taking away whatever powers the President or *anybody else might have*, by saying that it cannot be done except by an act of Congress." 117 Cong. Rec. 31536 (1971) (statement of Rep. Allen Smith) (emphasis added). This concern demonstrates the recognition, even at the time the statute was passed, that a prohibition on non-statutory detention could touch circumstances beyond the scope of internment, including beyond the Executive Branch. That, too, is exactly the case here, where Mr. Reddick is detained by the Court without authorization by an Act of Congress.[4]

Both the plain text and the legislative history of the Non-Detention Act supports its application here. Thus, the Court must have express statutory approval for Mr. Reddick's detention.

---

[4] The government also suggests that the NDA is inapplicable because it would create a distinction between citizens and non-citizens while on supervised release. But citizens and non-citizens are treated differently throughout the entire criminal process. Indeed, most non-citizens who are convicted of crimes in federal court are removed, or are removable, by virtue of their conviction.

5

B.  <u>The Non-Detention Act requires a clear statement of Congress to authorize detention.</u>

The Supreme Court has demanded, at minimum, the clearest authority from Congress when reviewing deprivations of personal liberty. "In traditionally sensitive areas … the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quotation marks omitted). Indeed, "especially in areas of doubtful constitutionality," "explicit" legislative action "requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Greene v. McElroy*, 360 U.S. 474, 507 (1959).  The "clear statement" rule applies with the greatest force where the government seeks to curtail personal liberty, especially through physical incarceration. For example, the Fifth Amendment demands criminal laws provide clear standards to ensure fairness and prevent arbitrary enforcement. In any event, where personal liberty is at stake, a court "construe[s] narrowly all delegated powers that curtail or dilute [that liberty]." *Gutknecht v. United States*, 396 U.S. 295, 306-07 (1970).

Congress reiterated these principles in 1972 when it enacted the Non-Detention Act, 18 U.S.C. § 4001(a), which prohibits detention "except pursuant to an Act of Congress." A clear statement of Congress must authorize detention. This entrenched principle does not disappear when the government seeks detention for an *alleged* violation of supervised release. No Act of Congress—neither 18 U.S.C. § 3583 or 18 U.S.C. § 3143—clearly authorizes Mr. Reddick's detention.

The government resists a plain reading of the NDA. Instead, the government argues that the NDA is satisfied even by a "provision lacking 'specific language of detention.'" Doc. No. 66 at 5 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 517 (2004) (plurality opinion)). The government is simply wrong. In reaching this conclusion the government primarily relies on the Supreme Court's plurality

6

opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The government's reliance on *Hamdi* is misplaced. Not only does the cited portion of the opinion lack precedential value, it is based on facts and reasoning wholly inapplicable to Mr. Reddick.

The facts of *Hamdi* are highly specific. *Hamdi* concerned "a United States citizen captured in a *foreign* combat zone," classified as "an enemy combatant," and later transferred to the United States where he was detained. *Id.* at 523. After Hamdi filed a habeas petition, the government argued the NDA was not a bar to his detention because Congress specifically authorized the detention of individuals likes Hamdi who are captured in the battlefield through the enactment of the Authorization for Use of Military Force (AUMF). *See id.* at 516–17.

Writing for four members of the Court, Justice O'Connor concluded that the AUMF provided the statutory authority to detain Mr. Hamdi. The AUMF, Justice O'Connor wrote, "authorizes the President to use 'all necessary and appropriate force' against 'nations, organizations, or persons'" associated with the September 11, 2001 terrorist attacks. *Id.* at 518. And "[b]ecause detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,'" Justice O'Connor continued, "Congress has clearly and unmistakably authorized detention in the *narrow* circumstances considered here." *Id.* at 519 (emphasis added).

Justice Souter, who provided the fifth vote for the judgment of the Court, disagreed with the plurality exactly on this point: that the AUMF supplies the statutory authority to satisfy the NDA. *See id.* at 541 ("The plurality . . . accept[s] the Government's position that [] Hamdi's . . . detention (at least as to some period) is authorized by an Act of Congress as required by § 4001(a), that is, by the Authorization for Use of Military Force. Here, I disagree and respectfully dissent." (citation omitted).

Justice Souter, who was joined by Justice Ginsberg, explained that the prohibition against detention in the NDA "has to be read broadly to accord the statute a long reach and to impose a burden of justification on the Government." *Id.* at 542. The NDA, Justice Souter stated, must be read "robustly to require a clear statement of authorization to detain." *Id.* at 545. "[E]ven if history had spared us the cautionary example of the internments in World War II," and "even if there had been no *Korematsu*," Justice Souter reasoned, separation of powers supplies another "compelling reason to read § 4001(a) to demand manifest authority to detain before detention is authorized." *Id.* at 544–45. Justice Scalia, who was joined by Justice Stevens in dissent, agreed with this view. *See id.* at 574 ("I do not think this statute [AUMF] even authorizes detention of a citizen with the clarity necessary to satisfy the interpretive canon that statutes should be construed so as to avoid grave constitutional concerns."); *accord infra* at 11–12 (summarizing Fifth Amendment jurisprudence on fair notice and separation of powers).

When viewed in this full context, it becomes clear that the government's reliance on *Hamdi* is misplaced. While four justices agreed that the AUMF "authorize[s] detention," thus satisfying the NDA, Doc. No. 66 at 8, four justices reached the *exact* opposite conclusion. Indeed, *Hamdi* provides just as much support for Mr. Reddick's position as it does for the government's. *Hamdi* therefore cannot carry the weight the government is attempting to put on it.

And in the context of a criminal case absent the wartime considerations of *Hamdi*, the views espoused by Justices Souter, Scalia, Ginsburg, and Stevens, align with the doctrines embedded in the Fifth Amendment and the "clear statement" rule. *See, e.g., Kolender v. Lawson*, 461 U.S. 352, 357 ("Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty."). In the criminal context, the Constitution has always required a clear statement of the law

8

and penalties and has read criminal statutes narrowly. For example, the Fifth Amendment's "void for vagueness" doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* ("Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Relatedly, the Fifth Amendment's "rule of lenity" upholds "the ancient rule that the law must afford ordinary people fair notice of its demands" and that "penal laws should [thus] be construed strictly." *Wooden v. United States*, 595 U.S. 360, 389 (2022) (Gorsuch, J., *concurring*) (quoting *The Adventure*, 1 F. Cas. 202, 204, F. Cas. No. 93 (No. 93) (CC Va. 1812) (Marshall, C. J.)).

These doctrines not only ensure that citizens are given fair notice but also vindicate the inviolate separation of powers by ensuring "the power to punish" first receives "the assent of the people's representatives and thus input from the country's 'many parts, interests and classes.'" *Id.* (quoting *The Federalist No. 51*, at 324 (J. Madison)). In this way, lenity "helps safeguard this design by preventing judges from intentionally or inadvertently exploiting 'doubtful' statutory 'expressions' to enforce their own sensibilities." *Id.* at 391. Together, the Fifth Amendment's "void for vagueness" and "rule of lenity" doctrines further buttress the "clear statement" rule embedded in the Non-Detention Act.

  C. <u>The Federal Rules of Criminal Procedure cannot "authorize" the detention of Mr. Reddick.</u>

In search of Congressional authorization for Mr. Reddick's detention, the government first argues that this Court has the authority to detain Mr. Reddick because Rule 32.1(a)(6) "unambiguously" authorizes detention pending revocation and is "presumptively valid." Doc. No. 66

at 2. Mr. Reddick does not deny that Rule 32.1 certainly *contemplates* that detention pre-revocation is possible. The government's argument, however, rests on a flawed premise: that a procedural rule could ever "authorize" detention. A procedural rule, no matter how unambiguous or "presumptively valid," can never abridge or modify a substantive right. Put another way: the government cannot use the presumption of validity of procedural rules as the *substantive evidence* that the rule is valid. To do so is to eviscerate the protections set forth in the NDA, which expressly require *Congressional* approval.

The Rules Enabling Act is clear that the rules cannot "abridge, enlarge or modify any substantive right." 28 U.S. Code § 2072. Rules prescribed in violation of the statutory authorization for their creation are invalid. Rule 32.1 abridges Mr. Reddick's fundamental liberty right. That right, clearly articulated in *United States v. Salerno*, can only be abridged by statute. 481 U.S. 739 (1987). A *rule*, by its own enabling legislation, cannot abridge that right. In *Salerno*, it was by virtue of "*Congress'* careful delineation of the circumstances under which detention" that 18 U.S.C. § 3142 passed constitutional muster. *Id.* at 751 (emphasis added). It was Congress's careful consideration of the liberty interests at stake and the process it designed that preserved the Bail Reform Act of 1984.

The Rules' haphazard reference to facially inapplicable statutes for supervised releasees facing revocation proceedings is not a careful delineation of circumstances by Congress permitting an intrusion on Mr. Reddick's liberty interest. This liberty interest is not inherently diminished by virtue of Mr. Reddick being under the Court's supervision. Mr. Reddick is subject to terms of supervision that outline the ways that his standing before the Court is different than an individual not under supervision. Those terms, and statutes otherwise imposing restrictions on individuals convicted of crimes, are the extent to which he is different than any other person appearing before the Court.

Those conditions of supervision make no reference to vulnerability to pre-revocation detention. Nor is there any statute permitting such detention. While Mr. Reddick is concededly subject to certain abridgements of his rights, those abridgements must be contained within his terms of supervision or statutes. Otherwise, he has the same rights as any person, including an unmitigated liberty right. Mr. Reddick cannot be detained absent a statute authorizing his detention. The Non-Detention Act guarantees this, and the history of detention in criminal cases further supports the proposition.

The government relies entirely on cases interpreting the rules of *civil* procedure for the broad proposition that the "presumption of validity" somehow is sufficient. But, as the Court can well appreciate, there are significant differences between criminal and civil practice. The Fifth Amendment—as well as the Non-Detention Act—demands more than the "presumption of validity" of a non-Congressional rule before a citizen can be detained.

D. Sections 3583(e) and 3143(a)(1) do not authorize detention.

Viewed against the backdrop of the NDA, the actual statutes proffered here to justify detention do not provide any clear authorization for pre-revocation detention.

First, Rule 32.1(6) itself references Section 3143(a)(1)—implying that Section 3143(a)(1) should contain the requisite statutory authority.[5] But that statute does not reference Rule 32.1 or even supervised release; it instead refers to individuals "awaiting sentence." Thus, there is no clear statement providing authority to detain Mr. Reddick pre-revocation.

---

[5] The government may suggest that the reference in Rule 32.1 to Section 3143(a)(1) necessarily implies that Section 3143 authorizes detention. But the authority for detention must be found in a *Congressional* enactment, not in a non-statutory rule.

11

The government suggests otherwise, claiming that a revocation sentence is part of the "original" sentence. But even if that were true—and it is not—that does not suggest that *indefinite, pre-revocation detention* absent a finding of a violation should be considered part of the sentence.

Moreover, the weighty "double jeopardy" concerns that flow from the government's definition of "offense" are far from settled. *See Mercado*, 2025 WL 297429, at *3 ("Neither *Johnson* nor *Peguero* gave any consideration whatsoever to the 'serious constitutional questions' raised by treating supervised release violation sentences as part of the original sentence that included supervised release. Indeed, the words "double jeopardy" simply do not appear in the *Peguero* majority opinion."). That fact alone counsels restraint in extending § 3143(a)(1) to pre-revocation detention. And indeed, the government's position leads to absurd results. If Mr. Reddick was indeed "found guilty of an offense" in April 2022, and if his "sentence" is not yet final, as the government contends, then Mr. Reddick will in effect be "awaiting"—violation or not—the imposition or execution of possible incarceration at any point prior to the end of his term of supervised release. If the government is correct, the Court would need to make a finding under § 3141(a)(1) prior to releasing Mr. Reddick from his halfway house at the end of his original term of incarceration. *See Wade*, 2025 WL 786383, at *2 n.3 ("The fact that no such finding by the court is required prior to the commencement of supervised release is a further indication that § 3143(a)(1) does not apply to supervised release or its revocation."). Of course, it made no such finding because § 3143(a)(1) does not naturally apply to pre-revocation release or detention.

Instead, § 3583(e) is the statute that specifically governs supervised release. But § 3583(e) says nothing of pre-revocation detention, instead incorporating by reference the Federal Rules of Criminal Procedure. These Rules, as explained *supra*, do nothing to enlarge a court's authority to

12

detain Mr. Reddick. In other words, they do not enlarge or abridge Mr. Reddick's substantive rights, such as his right to physical liberty. Rather, they govern his procedural rights, like the standard of proof applicable to questions of fact relevant to revocation. The government altogether blurs this distinction, arguing that the court's authority to order extraterritorial discovery under the Federal Rules of Civil Procedure necessarily implies the authority to order detention under the Federal Rules of Criminal Procedure. *See* Doc. No. 66 at 6–7 (citing *In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019)). The former, however, is a procedural right—one which the Federal Rules may control. The latter is not. The government makes no attempt to explain how the lesser power to order extraterritorial discovery in a civil matter justifies the greater power to order detention in a criminal matter. Nor could it.

In 18 U.S.C. § 3142(f) (dealing with pretrial detention hearings), Congress expressly provided for *pre-hearing* detention: "[t]he hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance....During a continuance, such person shall be detained". Congress did not elect to incorporate this language into § 3583(e). Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion". *Russello v. United States*, 464 U.S. 16, 23 (1983). "The 'specific solution' provided by §3583(e)(3) for violation of supervised release conditions is revocation of that release - but only *after* the court finds that the conditions have been violated." *Wade*, 2025 WL 786383, at *3. "Because § 3583(e)(3) does not authorize the court to temporarily detain [Mr. Reddick] pending his supervised release violation hearing, that authority cannot be implied." *Id.*

13

In the absence of a *clear* authorization of detention, the government cites legislative history, the statutory scheme, and the purpose of the statute. Although these factors may be relevant in a different case, they do not apply here. The Non-Detention Act requires clear congressional authorization to detain Mr. Reddick. Congress failed to pass a statute authorizing such detention. The Court should not resort to convoluted interpretations of facially inapplicable statutes to save a procedural rule that lacks the force of Congressional approval. In other words: if the law requires Congress to pass a statute, Congress must pass a statute. The Courts and the Rules of Criminal Procedure cannot fill a gap left by Congress.

Respectfully submitted,

THE DEFENDANT,
Chaz Reddick

FEDERAL DEFENDER OFFICE

Dated: March 21, 2025

/s/ *Anne E. Silver*
Anne E. Silver
Assistant Federal Defender
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106-1976
Phone: (860) 256-0310
Bar no.: phv207294
Email: anne_silver@fd.org

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on March 21, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                */s/ Anne E. Silver*
                Anne E. Silver